818 P.2d 401

Philip CARISTO, Petitioner,

v.

George E. SULLIVAN, Respondent.

Jimmy Neil KINSLOW, Petitioner,

v.

George E. SULLIVAN, Warden,
Respondent.

Nos. 19,190, 19,232.

Supreme Court of New Mexico.

Sept. 23, 1991.

Rehearing Denied Oct. 24, 1991.

eration of these cases—almost five years in Caristo's case and three and one-half years in Kinslow's. While we believe that a default judgment may be appropriate in an extreme case for the State's failure to respond to a writ of habeas corpus or other court order, we decline to impose that remedy in favor of either petitioner here. The State's conduct—though not a model of diligent attention to these pending cases—seems never to have reached the point of stubborn resistance to the court's orders that would justify such an extreme sanction. Nevertheless, we proceed to rule on the merits of both petitions in order to bring these protracted proceedings to an end and conserve judicial resources. We find that Kinslow is not entitled to relief and dismiss his petition; we reverse the denial of Caristo's petition and remand his case for resentencing.

Jacquelyn Robins, Chief Public Defender, Gina Maestas, Hilary Lamberton, Asst. Appellate Defenders, Santa Fe, for petitioner Caristo.

Robert J. Jacobs, Taos, for petitioner Kinslow.

Tom Udall, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for respondents.

## OPINION

MONTGOMERY, Justice.

We granted each petitioner's petition for a writ of certiorari[1] to the District Court of Santa Fe County to review the court's dismissal of each petitioner's petition for a writ of habeas corpus in that court. We ordered these review proceedings consolidated to consider an important issue common to both—whether the inordinate delays between the filing of the habeas petitions and their ultimate disposition in the district court entitled either petitioner to relief in the form of a default judgment or other remedy.

We are greatly concerned by the delays that occurred in the district court's consid-

### I.

The important facts relate to the merits of the petitioners' claims and the course of proceedings in each case.

#### A. *Caristo*

Petitioner Caristo was convicted in the District Court of Bernalillo County of one second-degree and two fourth-degree felonies. At the sentencing hearing, the State announced its intention to seek aggravation of the basic sentences for the offenses under NMSA 1978, Section 31–18–15.1 (Repl.Pamp.1990). That section permits the court to alter the basic sentence for the offense "upon a finding by the judge of any mitigating or aggravating circumstances surrounding the offense or concerning the offender." The judge found aggravating circumstances and increased the penalty for each offense by one-third of the basic sentence, the maximum amount permitted by the statute. *See* § 31–18–15.1(C). There is no indication in the record of the aggravating circumstances urged by the State at the hearing or of the circumstances relied upon by the judge in enhancing the sentence.

---

1. Pursuant to SCRA 1986, 12–501.

On August 1, 1985, Caristo petitioned the district court for a writ of habeas corpus, contending that his sentence was illegal because he had not been given notice of the State's intention to seek enhancement. Caristo filed his petition through counsel, the public defender, who represented him throughout the case. He also asserted that Section 31–18–15.1 was unconstitutional for failing to include a notice requirement.

The court issued a writ of habeas corpus shortly after the petition was filed. The writ ordered respondent (the warden at the penitentiary) to respond to the petition in writing and scheduled a hearing for September 26, 1985, at which respondent was to appear with Caristo. There is no record, however, that the writ was served upon respondent or the attorney general, and we accept respondent's representation that the writ was not in fact served. Accordingly, no response was filed by the State. For reasons unexplained by the parties and not apparent in the record, the scheduled hearing was not held.

In April of the following year, the court issued a second writ in the case. Again respondent was ordered to respond and to appear with petitioner at a hearing, this time scheduled for June 12, 1986. Again there is no record of service of the writ upon respondent or the attorney general. Respondent apparently learned of the hearing date only after Caristo's counsel sent a discovery request to the Corrections Department. Respondent then filed a motion for continuance, which the court granted on June 9, 1986.

After one and one-half months had passed without the court's rescheduling a hearing, Caristo requested a hearing on the merits of the petition. The court did not act on the request. There was no further activity in the case for almost a year, when on June 9, 1987, the court issued an order to show cause why the case should not be dismissed for inactivity of the file.[2] Caristo failed to respond to the order and the case was dismissed; however, the public

defender objected to the dismissal and requested a hearing, whereupon the court reinstated the case on July 22, 1987.

The court failed to act upon Caristo's renewed request for a hearing and on February 4, 1988, again ordered Caristo to show cause why his case should not be dismissed for inactivity. This time the court held a hearing on the show cause order, at which it determined that the case would not be dismissed and that an evidentiary hearing on the merits would be required.

The court at last held such a hearing on May 11, 1988. Caristo presented testimony, undisputed by the State, that he had not received notice of the State's intention to seek enhancement of the basic penalty and only learned that enhancement would be sought at the sentencing hearing itself. Both sides then presented legal argument on whether notice was required, and the court indicated a ruling would be issued within two weeks.

The court, however, never issued a ruling. Soon after the hearing, Caristo was informed that the case would be transferred to another judge, whereupon he moved that the judge who had presided over the case up to that point, including the evidentiary hearing, be permitted to retain the case because a transfer at that stage would "disrupt the orderly resolution of Petitioner's case." Over this objection, the case was transferred to another division on June 6, 1988.

After three months had passed without a ruling from the court, Caristo filed a request for a ruling. Another three months passed without a ruling, after which the court issued a third order to show cause why the case should not be dismissed for inactivity. Caristo responded to the order on February 7, 1989, pointing out that an evidentiary hearing had been held and a request for a ruling filed, and that there had been no recent activity in the case "because petitioner is awaiting a ruling by

---

2. Issuance of such orders appears to be a routine procedure by which the court attempts to purge inactive files.

the Court." He renewed his request for a ruling.

Again the court failed to respond to the request. On April 17, 1989, almost a year after the evidentiary hearing, Caristo for a third time requested a ruling from the court. Again, however, the court failed to issue a ruling on the petition, although it did order, finally, respondent to respond to the petition. As with previous orders, however, there is no indication that the order was served by Caristo or by the court upon respondent. The State filed no response.

After almost nine months had passed without a ruling from the court or a response from the State, Caristo obtained a certificate of nonappearance and on January 11, 1990, filed a motion for default judgment, accompanied by a memorandum of points and authorities. Respondent filed a response to the motion on January 16, 1990, and Caristo replied on January 22.

Once again, however, the court took no action. On March 9, 1990, Caristo for the fourth time requested a ruling from the court. This time—almost five years after the initial petition had been filed and almost two years following the evidentiary hearing—the court, without considering the record of the evidentiary hearing, summarily dismissed the petition, reciting "Petitioner is not entitled to relief as a matter of law."

### B. *Kinslow*

Petitioner Kinslow was serving a life sentence (the first of three) for murder when on June 29, 1981, he escaped from the Wyoming correctional facility where he was serving the sentence under an interstate prison compact. He was apprehended seventeen days later in the state of Georgia and was incarcerated in the Georgia state prison on an unrelated charge. After serving his term in Georgia for the Georgia offense, he was returned to the custody of New Mexico corrections officials and incarcerated in the state penitentiary to serve the remainder of his New Mexico sentences. The Department set back his parole eligibility date by the four

years, seven months, and four days that he was out of its actual or constructive custody. On his "Good Time Figuring Sheet"— a form used by the Department to keep a record of meritorious "good time" awards earned and forfeited by an inmate and to calculate parole eligibility and discharge dates [3]—the four-plus years were shown as having been "forfeited" from his good time credits in a column headed "Credits Forfeited." Despite the suggestion in the sheet that the Department had forfeited credits he had previously accrued, the Department nevertheless awarded him credit upon his return for good time served before the escape. He resumed earning good time credits upon his return.

Asserting that the Department had illegally deprived him of more than four and one-half years of good time credit, Kinslow petitioned the district court for a writ of habeas corpus, claiming that prison officials should only have forfeited the seventeen days during which he was an escapee until his capture by Georgia authorities. He also maintained that the Department was not statutorily authorized to forfeit more than thirty days of good time and that the "forfeiture" abridged his due process rights to notice and hearing.

Appearing pro se, Kinslow filed his petition on January 5, 1987, and sent a notice of filing on that day to the Department. On January 13, the attorney general was served with a summons; but the warden at the penitentiary, apparently, was not. After one and one-half months had passed without an initial ruling from the district court or a response from the State, Kinslow filed a motion for default judgment and a request for hearing. The court never scheduled a hearing, however, and the State did not respond. Four months later, on July 16, 1987, the case was transferred to another division of the court.

The case languished without activity until five months later, when Kinslow renewed his request for hearing on the default motion and requested that counsel be appointed for him. The court appointed

---

**3.** Pursuant to NMSA 1978, Sections 33–2–34 to –38 (Repl.Pamp.1990).

the public defender as his counsel on January 5, 1988. Again the court failed to order any action in the case for over a year, other than to transfer the case a second time to another division in June 1988. On January 26, 1989, the court issued to the public defender an order to show cause why the case should not be dismissed for lack of activity.

The public defender promptly responded, noting that the court had not yet responded to Kinslow's habeas petition or his request for a hearing and requesting that the court follow the procedure required by SCRA 1986, 5–802. This rule requires the court upon receipt of a habeas petition to examine it "promptly" and either to order summary dismissal or to direct the respondent to file a response. The court took no action following counsel's request.

On May 18, 1989, the public defender filed a motion for an order to compel the State to respond to Kinslow's petition. At the same time, the defender noted that since the court had not yet ordered a response, appointment of counsel for petitioner under Rule 5–802 was premature; the public defender accordingly moved to withdraw pending a response to the petition. The court failed to rule on either motion. On July 12, 1989, Kinslow filed a third request for a hearing on his default judgment motion, which the court (also for the third time) failed to act upon. The case was then transferred between divisions of the district court for the third time.

The year 1990 began with a fourth transfer of the case to another judge, ordered on January 24. On April 2, 1990, the court for a second time ordered Kinslow to show cause why his case should not be dismissed for inactivity. This order was addressed directly to Kinslow rather than to the public defender, although the defender's motion to withdraw had never been granted. Kinslow requested the defender's assistance in responding to the order. The public defender responded by informing Kinslow that the defender could not respond to the court's order because his case lacked merit. Kinslow failed to make any response pro se, and on May 31, 1990—three

and one-half years after the petition had been filed—the court ordered the case dismissed for inactivity of the file.

## II.

We have recited the facts above in some detail to demonstrate the numerous delays, failures to act, and inappropriate orders for which the district court was chiefly responsible in these cases. To summarize, in Caristo's case the court (1) failed initially to respond to Caristo's request for a hearing, (2) failed to rule on the petition until almost two years after the evidentiary hearing, (3) failed to respond to repeated requests for a ruling, (4) issued repeated orders to show cause why the case should not be dismissed despite pending motions and requests for hearing or a ruling, and (5) entered a summary dismissal after an evidentiary hearing had been held. In Kinslow's case the court (1) failed to rule on the petition until three and one-half years after it was filed, (2) failed to respond to repeated requests for a hearing on the motion for default judgment, (3) failed to respond to a motion to compel a response from respondent, (4) transferred the case between judges no less than four times, and (5) issued repeated orders to show cause for inactivity of the file, when the "inactivity" was plainly due to pending motions or requests that had not yet been acted upon.

It is true that both petitioners could have taken steps beyond their repeated requests for action by the court which might have ensured that their petitions received the court's or the respondent's attention. For example, either could have applied to this Court for a writ of mandamus directing the district court to rule on his petition or to hold hearings on the merits or on default motions. In addition, either could have made sure that respondent was properly served with the petitions, writs, and orders to respond. At times each petitioner was not represented by counsel; each was an inmate at the state penitentiary, and we believe that both the district court and the attorney general's office could have instituted procedures to ensure that these cases

did not simply sit on the court's docket waiting for someone to do something.

■ Nor does a busy court docket adequately explain what occurred in these cases. While court congestion undoubtedly played a major role in retarding the progress of these cases, complete responsibility for their slow progress cannot be assigned to that factor alone. The United States Supreme Court has made clear that "[t]here is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus...." *Harris v. Nelson*, 394 U.S. 286, 292, 89 S.Ct. 1082, 1087, 22 L.Ed.2d 281 (1969). Because the writ of habeas corpus protects our most basic right of freedom from illegal restraint on personal liberty, the writ must be construed to afford " 'a swift and imperative remedy in all cases of illegal restraint or confinement,' " *Fay v. Noia*, 372 U.S. 391, 400, 83 S.Ct. 822, 828, 9 L.Ed.2d 837 (1963) (quoting *Secretary of State for Home Affairs v. O'Brien*, 1923 App.Cas. 603, 609), and therefore requires *"prompt* adjudication of the validity of the challenged restraint," *Peyton v. Rowe*, 391 U.S. 54, 59, 88 S.Ct. 1549, 1552, 20 L.Ed.2d 426 (1968) (emphasis in original). "The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if the trial courts do not act within a reasonable time." *Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir.1978).

■ Unreasonable delays in the processing of a habeas petition may deny the petitioner constitutional due process. *See Jones*, 572 F.2d at 1280 (court's 14–month delay denied petitioner due process); *Ruiz v. Cady*, 660 F.2d 337, 341 n. 5 (7th Cir. 1981) (unreasonable delay may satisfy requirement for availability of writ that confinement be in violation of the Constitution); *cf. Seemiller v. Circuit Court Clerk*, 640 F.2d 175, 176 (8th Cir.1981) (Section 1983 action for violation of constitutional rights premature in light of only three-month delay).

The delays in these cases are not attributable entirely to lack of management by the district court. The treatment accorded the claims by the State and even, to some extent, by the public defender also seems to have been somewhat cavalier at best. In any event, these delays, whatever their cause, provide an additional reason for our conclusion that petitioners are entitled to review on the merits.

## III.

Both Kinslow and Caristo argue that the delays by the State and the district court entitled them to default judgments on their habeas corpus petitions and that the district court erred in failing to grant their motions for default. The State responds that default judgment is not authorized against it. All parties, relying on seemingly well-settled New Mexico precedent, *see, e.g., State v. Weddle*, 77 N.M. 420, 423 P.2d 611 (1967), assert that habeas corpus actions are civil proceedings and that Rule 55 of the Rules of Civil Procedure, SCRA 1986, 1–055, therefore governs the availability of default judgment in these cases.

In considering petitioners' assertion that a default judgment is available in a habeas corpus proceeding, we begin by noting that we seriously question whether Rule 1–055—and for that matter any of the Rules of Civil Procedure—applies in these cases. Both Caristo and Kinslow's petitions are post-conviction habeas corpus petitions. Since 1975, this Court, by including the rules relating to post-conviction collateral attacks and habeas proceedings in the Rules of Criminal Procedure, has signaled a modification of the traditional rule that such proceedings are civil in nature. *See* SCRA 1986, 5–802; *see also* N.M.R.Crim.P. 57 (Repl.Pamp.1985).

In 1975, we adopted Rule 57 of the Rules of Criminal Procedure to govern motions for post-conviction relief. This rule superseded a former rule of *civil* procedure, Rule 93, as the applicable rule in such proceedings. The committee commentary to Rule 57 expressed the position that the rule was intended to incorporate the federal view of post-conviction motions under 28

U.S.C. § 2255 (1988)[4]—that such proceedings are a further step in the movant's *criminal* case and not a separate civil action. Thus, the committee stated that Rule 57 "supersedes cases holding that the post-conviction remedy is a separate civil action. *See, e.g., State v. Hardy,* 78 N.M. 374, 377, 431 P.2d 752, 755 (1967)."

We agree with the committee that post-conviction habeas petitions are not appropriately characterized as civil actions. As one court observed of the federal laws governing post-conviction habeas corpus proceedings by state prisoners under 28 U.S.C. § 2254 (1988):

> These rules are special ones governing collateral attacks on criminal convictions and are distinct from both the Federal Rules of Criminal Procedure and Federal Rules of Civil Procedure. This distinction is made because habeas corpus proceedings are a hybrid, being civil dispositions of already-resolved criminal matters. Thus, habeas cases are not automatically subject to the rules governing ordinary civil actions.

*Dillard v. Blackburn,* 780 F.2d 509, 514 (5th Cir.1986).

Caristo filed his petition in 1985 and thus invoked Rule 57, which governed post-conviction motions filed between September 1, 1975, and March 1, 1986. His action was therefore not a civil action and thus is not controlled by the Rules of Civil Procedure.

Kinslow filed his petition in 1987, and his action is therefore governed not by Rule 57 but by Rule 5–802, applicable to habeas petitions filed after March 1, 1986. We believe that post-conviction habeas actions under this rule, as under Rule 57, are no longer appropriately characterized as civil proceedings.[5]

Nevertheless, we also believe that default judgment should be available in post-conviction habeas proceedings. The district court, in the exercise of its original jurisdiction under Article VI, Section 13, of our state constitution to issue writs of habeas corpus, has the inherent power to find a recalcitrant respondent in default and to impose an appropriate sanction for noncompliance with its orders, including even the relief requested in the petition.

It is true, as the State argues, that an award of default judgment runs the risk of burdening the public for the failures of its state officials. For this reason, some courts have held that default judgments are inappropriate in habeas cases. *See United States ex rel. Mattox v. Scott,* 507 F.2d 919, 924 (7th Cir.1974); *Allen v. Perini,* 424 F.2d 134, 138 (6th Cir.), *cert. denied,* 400 U.S. 906, 91 S.Ct. 147, 27 L.Ed.2d 143 (1970). However, we find this rationale insufficient to deny the availability of this remedy in habeas proceedings.

In the first place, the court may determine that the public safety may be adequately preserved by subjecting a requested default judgment to the same limitation as is provided in Rule 1–055(E)—that no default may be entered against the state "unless the claimant establishes his claim or right to relief by evidence satisfactory to

---

**4.** Section 2255 governs motions for post-conviction relief by prisoners in federal custody.

**5.** We note that Rule 5–802, unlike its predecessor, Rule 57, is not limited by its terms to post-conviction habeas actions and on its face appears to apply to all habeas corpus proceedings, whether challenging confinement before or after conviction or, for that matter, civil custody. The rule provides, in pertinent part:

> *A. Scope of Rule.* This rule governs the procedure for filing a writ of habeas corpus by persons in custody or under restraint for a determination that such custody or restraint is, or will be, in violation of the constitution or laws of the State of New Mexico or of the United States[.]

Habeas proceedings challenging preconviction or civil custody, however, are unrelated to any prior criminal proceeding and are still appropriately characterized as civil actions, brought under NMSA 1978, Sections 44–1–1 to –38. We need not and do not address whether Rule 5–802 applies to—and, if it applies, whether it provides the exclusive procedure for—these civil actions. *See State v. Peppers,* 110 N.M. 393, 395–97, 796 P.2d 614, 616–18 (Ct.App.) (Rule 5–802 not exclusive means for seeking post-conviction relief), *cert. denied,* 110 N.M. 260, 794 P.2d 734 (1990). It would seem, however, that even if Rule 5–802 applies, the Rules of Civil Procedure, including Rule 1–055, would also apply (except, perhaps, to the extent inconsistent with Rule 5–802).

the court."[6] *See Bermudez v. Reid,* 733 F.2d 18, 21–22 (2d Cir.) (principles of federal Rule 55(e) should govern in habeas cases), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984). This would ensure that petitioners with meritless claims are not set free or permitted to burden state resources with a retrial.

Even if default judgments were permitted without a full inquiry into the merits, the burden on the public might be purely fiscal, since an award of default judgment in a habeas proceeding does not necessarily require the petitioner to be set free; rather, the court may determine the proper remedy for default and can simply order that an evidentiary hearing be held or proceed to rule on the merits of the petitioner's claim without considering any response by the state. The courts in *Mattox* and *Perini,* while holding that default judgment is not available in habeas proceedings (believing that a default judgment would require the petitioner's release), nevertheless fashioned one of these alternative remedies as a sanction for the delay. *Mattox,* 507 F.2d at 924; *Perini,* 424 F.2d at 138. In this regard we also note that Caristo, in his certiorari petition in this Court, specifically requested only that the case be remanded for an evidentiary hearing if a default were entered; the same remedy was requested in the alternative by Kinslow.

■ Finally, the additional time and expense of having to order a new trial or sentencing proceeding if default judgment is permitted is not an adequate reason to deny the availability of default in a habeas proceeding. We agree that "[w]here the respondent is guilty of long and inadequately explained delays, it may be presumed that the petitioner is being illegally confined." *Ruiz,* 660 F.2d at 340. The remedy is therefore necessary to vindicate a petitioner's rights and as a sanction against the state in those extreme cases in which it is guilty of lengthy and unwarranted delay.

■ Notwithstanding the availability of a default judgment in an extreme case, in the cases before us it is questionable that the State may be severely chastised (at least to the extent of imposing a default judgment as a sanction) for the delays and for the lack of any responses to the petitions. In *Kinslow,* as we have indicated, the State was never under a court-imposed duty to respond to the petition. In *Caristo,* although the court issued two writs and one order commanding a response, these commands apparently were never served upon respondent. Additionally, respondent, through the attorney general, appeared at the evidentiary hearing and responded to Caristo's motion for default judgment. In light of these facts, we doubt that default would have been appropriate in either case.

## IV.

We turn now to the merits of petitioners' claims. Although Kinslow's case was dis-

---

**6.** The State contends that Rule 1–055(E) prohibits default judgment against the state. Paragraph (E) reads:

> E. *Judgments against the state; exceptions.* No judgment by default shall be entered against the state or an officer or agency thereof or against a party in any case based upon a negotiable instrument, or where the party was only constructively served with the process, or where the damages claimed are unliquidated *unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.*

SCRA 1986, 1–055(E) (emphasis added). The State argues that the exception at the end of the paragraph applies only to cases involving unliquidated damages.

Paragraph (E) was derived from Rule 55(e) of the Federal Rules of Civil Procedure, which provides:

> No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.

Considering the rules together, it is apparent that the exception at the end of the paragraph applies to the prohibition of a default judgment against the state. A default judgment, therefore, is available under Rule 1–055(E) against the state if the claimant establishes his right to relief. The clauses added to our state rule were intended to establish additional categories of cases in which a default judgment would not be permitted unless the claimant established a valid cause of action by evidence satisfactory to the court.

missed for inactivity after he failed to respond to the court's order to show cause, in the interest of judicial economy we treat the dismissal as a dismissal on the merits of the petition. In Caristo's case, the court summarily dismissed the petition for its failure to state a valid claim for relief, and we therefore proceed to review that dismissal on the merits.

### A. Caristo

Caristo claims that his sentence is illegal because he was not given notice prior to his sentencing hearing of the State's intention to seek enhancement of his basic sentence under NMSA 1978, Section 31–18–15.1, which permits the court to enhance the penalty for the offense upon a finding of aggravating circumstances.

In *State v. Rhodes*, 76 N.M. 177, 181, 413 P.2d 214, 217 (1966), we established the principle that "essential fairness requires that there be some pleading filed by the state ... by which a defendant is given notice and opportunity to be heard before an increased penalty can be imposed." This principle has since been applied unwaveringly in a line of cases requiring notice under various sentence-enhancement statutes. *See State v. Stout*, 96 N.M. 29, 627 P.2d 871 (1981) (second conviction of armed robbery under Section 30–16–2 (Repl.Pamp.1984)); *State v. Smith*, 110 N.M. 534, 797 P.2d 984 (Ct.App.) (enhancement for injury to person sixty years of age or older under Section 31–18–16.1 (Repl.Pamp.1990)), *cert. denied*, 110 N.M. 533, 797 P.2d 983 (1990); *State v. Morton*, 107 N.M. 478, 760 P.2d 170 (Ct.App.1988) (aggravating circumstances for death penalty under Sections 31–20A–2, –5 (Repl. Pamp.1990)); *State v. Barreras*, 88 N.M. 52, 536 P.2d 1108 (Ct.App.1975) (enhancement for use of a firearm under NMSA 1953, 2d Repl.Vol. 6, Section 40A–29–3.1 (1972)).

Respondent counters that enhancement under Section 31–18–15.1 is different and that the cases cited above are inapplicable. He argues that each case in which we have held that prior notice was required involved statutes where enhancement was predicated upon proof by the state of a certain fact, such as injury to a person sixty years of age or older, use of a firearm, or a prior conviction. Aggravation under Section 31–18–15.1, however, does not require the state to prove a specific fact enumerated in the statute. Moreover, respondent asserts, the court has authority under the statute to enhance a basic sentence based on any of the potentially limitless relevant circumstances irrespective of whether the state has sought enhancement. *See State v. Segotta*, 100 N.M. 498, 501, 672 P.2d 1129, 1132 (1983). Respondent also maintains that the statute itself provides adequate notice that a sentence may be aggravated. A defendant is already entitled to a hearing and an opportunity to be heard under the statute, *Tomlinson v. State*, 98 N.M. 213, 647 P.2d 415 (1982); and, he asserts, nothing more is required.

We disagree. We believe the principle established in *Rhodes* is fundamental to due process and applies whether or not the state is required to allege and prove a specific fact before the sentence may be enhanced. While we established in *Tomlinson* that a defendant is entitled under Section 31–18–15.1 to a hearing and an opportunity to be heard, these rights are virtually meaningless if the defendant is not first given notice of the specific aggravating factors on which the state intends to rely so that the defendant will have an opportunity to prepare a response. The statute itself, by providing notice of the possibility of aggravation, therefore does not provide adequate notice.

We recognize that if aggravation under the statute is premised upon a circumstance which itself was an element of the offense or a fact upon which such an element was established, the defendant will already have been put on notice of the aggravating circumstance and will have had an opportunity to prepare a response. *See Barreras*, 88 N.M. at 54–55, 536 P.2d at 1110–11. We therefore hold that under Section 31–18–15.1 a defendant must be given notice of the state's intention to seek aggravation and of the aggravating circumstances on which it intends to rely,

unless the circumstance was itself an element of the underlying offense or a fact used to establish such an element. While the court may rely upon aggravating circumstances not urged by the state, the court should also provide notice to the defendant of those circumstances that were not established at trial under the foregoing exception.[7]

■ Because there is no indication in the record of the circumstances relied upon by the trial judge in enhancing Caristo's sentence, we have no way of knowing whether Caristo was entitled to notice. Rather than hold an additional hearing on this issue, in the interest of judicial economy we reverse the district court's dismissal of Caristo's petition, vacate his prior sentence, and remand with instructions to enter an order directing respondent to deliver petitioner to the sentencing court for a new hearing under Section 31–18–15.1, to be conducted in conformity with this opinion.

## B. *Kinslow*

Kinslow's petition raises three related issues regarding the legality of his detention. First and foremost, he argues that the Department acted illegally and in violation of his due process rights by "forfeiting" from his good time credits four years, seven months, and four days for his escape, rather than only the seventeen days he was at large, and by not awarding him credits for time served in the Georgia prison. He also asserts that he was not given any notice of the "forfeiture" or opportunity to challenge the Department's actions in a disciplinary hearing and that the Department was only authorized to forfeit up to a maximum of 30 days of good time credit.

■ There is no merit to Kinslow's claim of entitlement to credit for time served on his separate Georgia offense. It is axiomatic that he could not earn actual *or* good time credit on his New Mexico sentence for

confinement which was unrelated to his New Mexico offense. *Sampley v. Morris,* 632 P.2d 837, 839 (Utah 1981) ("no basis in law, logic or justice" to give credit on Utah sentence for time served in foreign state penal institutions on separate offenses committed while on escape from Utah).

■ We accept the proposition that had the Department actually forfeited good time credits already earned or his ability to earn good time credit in the future, he might have been entitled to notice and a hearing on the validity of the forfeiture. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (minimum requirements of procedural due process apply to deprivation of state-created right to good time credit). Additionally, the legality of the amount of the forfeiture might have been called into question. However, notwithstanding the fact that the four-plus years in question appear in the "Credits Forfeited" column on Kinslow's Good Time Figuring Sheet, we determine that his credits were not in fact forfeited. He was awarded good time credits earned before his escape and began accruing good time after his return to New Mexico. Service of his sentence was merely suspended during the period in question; he simply was not given actual or good time credit for the period during which he was not serving his New Mexico sentence. This conclusion answers Kinslow's other claims.

The order of the district court dismissing Kinslow's petition for a writ of habeas corpus is accordingly affirmed, with prejudice.

IT IS SO ORDERED.

RANSOM and FRANCHINI, JJ., concur.

---

7. Ordinarily, adequate notice will be afforded by the presentence report, provided it clearly informs the defendant that the state will seek aggravation of the penalty (if in fact the state intends to do so) and refers to the facts to be relied on (if those facts are not covered by the exception stated in the text). The presentence report should also inform the defendant that the court may enhance the penalty on its own motion based upon facts adduced at trial or contained in the presentence report.